The mother appeals from decrees by a judge of the Juvenile Court terminating her parental rights as to her three oldest children, Rowena, Adam, and Michael (collectively, the children).[3] Having considered the mother's arguments, we affirm.
1. Background. We draw on the detailed findings of fact made by the judge below, which find ample support in the record. The mother has a mild to moderate intellectual disability, is illiterate, and suffers from depression and an anxiety disorder, posttraumatic stress disorder (PTSD). These limitations affect her ability to care for the children, each of whom has special needs.[4]
The mother began voluntary services with the Department of Children and Families (DCF or department) in April, 2009. From that time to October, 2011, DCF received several reports regarding the family, pursuant to G. L. c. 119, § 51A, which it found were supported for allegations of neglect due to lack of supervision. The reports indicated that Rowena's aggression, which included Rowena scratching Adam with a metal fork, was difficult for the mother to control; the mother medicated Rowena with a drowsiness-inducing antihistamine because she could not address the child's outbursts; the mother left Michael, who was then one year old, alone inside the home; Adam had been found naked in the mother's home with several visible dog bites on his body; the parents would regularly fight in the presence of the children; and the mother repeatedly lied to authorities about incidents involving the children's well-being.
In October, 2011, Rowena stabbed Michael with a butter knife, and the mother declined the advice of the DCF social worker to take the children to the hospital immediately. Thereafter, DCF filed a care and protection petition, pursuant to G. L. c. 119, § 24, and obtained temporary custody of the children. All three children had severe problems when initially entering foster care, including urinating or defecating in inappropriate areas and sexualized behaviors. Each child has received a variety of intervention services.
Following removal of the children from the mother's custody, DCF implemented service plans in order to help the mother develop parenting skills to permit reunification. Among other things, the mother was required to attend family visits on a regular basis, participate in therapy to address her own mental health needs, and obtain stable housing. Because the mother is illiterate, DCF went over these tasks verbally with the mother. Additionally, a parent aide met with the mother twice a week for nine months to assist her in developing parenting skills and keeping track of the children's appointments. Once the aide was discontinued, the DCF social worker tried to help the mother during visits. Once these services ended, the mother was unable to apply these skills to control the children's behavior or keep track of their appointments.
In March, 2013, the parents stipulated to their unfitness, and DCF was granted permanent custody of the children. In June, 2014, DCF filed a motion for review and redetermination, pursuant to G. L. c. 119, § 26(c ), seeking to dispense with the parents' rights to consent to the adoption of the children.
A trial was held over ten days between July and October, 2015. The judge found that, while the mother made efforts to comply with her service plan tasks, she was largely unsuccessful. For example, the mother visited the children regularly during the first two years following their removal; however, the mother missed approximately one-half of the visits with the children starting in 2013. After she moved to Washington State in September, 2014, the mother ceased visits until March, 2015, when she saw the children while she was in Massachusetts for a court hearing. She has not requested any contact with them since. The mother testified that seeing the children made her depressed and that she had stopped seeing them because it made her sad. The mother was similarly unsuccessful in her individual therapy task. For the two years immediately preceding trial, the mother had not provided DCF with any documentation of her attendance at any type of therapy. Further, the mother did not obtain stable housing. Between 2012 and 2014, she lived in at least five different residences. The mother move to Washington State in 2014, lived with her sister temporarily, and obtained subsidized housing; however, during the pendency of trial, the mother left that subsidized housing and moved to Florida.
Since the removal of the children, the mother admits that she continues to miss appointments for the daughter who remains in her custody-a child with severe special needs.[5] She refused to participate in a parenting skills program in Washington State because she had too many appointments for her daughter.
The judge found that both parents were unfit, that the unfitness was likely to continue into the indefinite future to a near certitude, and that termination of their parental rights was in the children's best interests. He accordingly issued decrees terminating their parental rights. This appeal followed.[6]
2. Discussion. "To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests." Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). On appeal, "[w]e give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. 53, 59 (2011).
On appeal, the mother contends that the trial judge (1) erred in finding that DCF made reasonable efforts to reunify the family by providing services that accounted for her cognitive limitations and other needs, (2) abused his discretion in terminating her parental rights because he failed to consider her cooperation with DCF and compliance with some of the service plan tasks, and (3) did not consider Michael's best interests individually. We address each argument in turn.
a. Reasonable efforts. "Where a parent, as here, has cognitive or other limitations that affect the receipt of services, the department's duty to make reasonable efforts to preserve the natural family includes a requirement that the department provide services that accommodate the special needs of a parent." Adoption of Ilona, 459 Mass. at 61. "Nevertheless, heroic or extraordinary measures, however desirable they may at least abstractly be, are not required." Adoption of Lenore, 55 Mass. App. Ct. 275, 278 (2002). "A judge may consider [DCF's] failure to make reasonable efforts in deciding whether a parent's unfitness is merely temporary." Adoption of Ilona, 459 Mass. at 61. However, a judge's conclusion that a parent's unfitness is temporary must rest on credible evidence supporting a reasonable likelihood that the parent will become fit, not on a "faint hope." Adoption of Inez, 428 Mass. 717, 723 (1999). Even where DCF has failed to meet its obligation to make reasonable efforts, "a trial judge must still rule in the child's best interest." Adoption of Ilona, 459 Mass. at 61.
We review the judge's finding of reasonable efforts for clear error. See id. at 62. "A finding is clearly erroneous when there is no evidence to support it, or when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " Custody of Eleanor, 414 Mass. 795, 799 (1993), quoting from Building Inspector of Lancaster v. Sanderson, 372 Mass. 157, 160 (1977). We discern no such error.
The record supports the judge's finding that DCF made reasonable efforts to provide the mother with services that accommodated her cognitive and other limitations. DCF social workers reviewed the service plans and each required task verbally with the mother, asking whether the mother understood the tasks as each was explained. DCF provided the mother with a parent aide to help the mother develop parenting skills in order to regain custody of the children. According to the testimony, parent aides usually meet with parents once a week for three months. In this case, to accommodate the mother's needs, the parent aide worked with the mother twice a week for nine months. The parent aide created color-coded calendars to help the mother keep track of appointments, advised the mother of other available services, attended parent-child visits to advise and assist the mother to respond to the children's violent and aggressive behavior, and provided pictures to instruct the mother on parenting skills. Further, DCF scheduled each of the parent-child visits for the same time and on the same day of the week in an attempt to avoid confusion and assist the mother with attendance at these visits. DCF would also call the mother on the day before a visit to confirm that she would be attending. After the parent aide's services ended, a DCF social worker attempted to instruct the mother on how to maintain control of the children during the parent-child visits.
We are satisfied that the record supports the judge's finding that DCF made reasonable efforts to preserve the family by accommodating the particular needs of the mother, and the mother cites no credible evidence in the record to support her assertion that additional services could have had an effect on her parenting skills. To the contrary, despite the services that DCF provided, the mother was not able to apply new skills when services were discontinued.
b. Consideration of mother's efforts. The mother next argues that the judge's decision to terminate her parental rights was unsupported because he failed to consider her cooperation with DCF and compliance with certain service plan tasks. We disagree. "Even where a parent has participated in programs and services and demonstrated some improvement, we rely on the trial judge to weigh the evidence in order to determine whether there is a sufficient likelihood that the parent's unfitness is temporary." Adoption Ilona, 459 Mass. at 59-60.
Here, contrary to the mother's assertion, the judge specifically considered her cooperation with the parent aide provided by DCF, her completion of a supportive care class, and her regular attendance at visits with the children for the first two years following their removal. The judge specifically weighed this evidence against the evidence that the mother (1) was unable to apply the skills that the parent aide had taught her once the service was removed, (2) missed several supportive care classes and took six months to complete the twelve-week course due to poor attendance, and (3) missed one-half of the scheduled visits with the children starting in 2013, ceased regular visits in 2014 when she moved to Washington State, last saw the children in early 2015, and had not requested any contact with the children since that time. The judge also considered that the mother failed to address her own mental health issues even though those issues impaired her ability to care for the children, and that she had not obtained stable housing despite the children's heightened need for stability in light of their numerous special needs.
In light of all the evidence and the judge's specific findings, we discern no error in the judge's conclusion that the mother's inability to provide for the children's needs rendered her unfit, that this unfitness would continue into the foreseeable future, and that the best interests of the children would be served by termination of parental rights.
c. Michael's special needs. In determining whether to terminate a parent's rights, a trial judge must consider the best interests of each of the children individually. See Petitions of Dept. of Social Servs. to Dispense with Consent to Adoption, 20 Mass. App. Ct. 689, 697 (1985). The mother argues that the judge failed to do so with respect to Michael who, according to the mother, has no special needs. This argument is unsupported. Michael has multiple behavioral and emotional challenges, suffers from low-grade anxiety and a low-grade impulse control disorder, and has exhibited sexualized behavior in foster care, for which he continues to receive therapy.
Moreover, while Michael's needs are not as severe as those of Rowena and Adam, the mother is currently struggling to parent the one child remaining in her custody, who herself has intensive needs and numerous appointments that are difficult for the mother to keep. Coupled with Michael's behavioral and emotional issues and the mother's own mental health issues, the judge did not err in concluding that caring for more than one child would be overwhelming for the mother. See Adoption of Abigail, 23 Mass. App. Ct. 191, 193 (1986).
Decrees affirmed.

The mother has two other, younger children, a son and a daughter. The son was originally part of the underlying care and protection petition, but was later returned to the mother's care. At the time of trial, however, he was in the custody of a family friend under a permanent guardianship agreement. At the time of trial, the younger daughter was in the mother's custody.

Rowena has been diagnosed with attention deficit hyperactivity disorder, emotional disorders, and PTSD; she also has aggression issues. Adam has been diagnosed with an unspecified intellectual disability and is autistic. Michael has been diagnosed with low grade anxiety and low grade impulse control disorders.

This daughter was born with developmental delays, has demonstrated aggressive behavior, including biting other children, and the mother believes she may be autistic. She receives counselling, early intervention services, and physical therapy.

The father has not appealed from the termination of his parental rights.